708 So.2d 797 (1998)
Eric SMITH
v.
E. Wyman WALKER, M.D.
No. 96 CA 2813.
Court of Appeal of Louisiana, First Circuit.
February 20, 1998.
*798 Richard Upton, Baton Rouge, for plaintiff/appellee Eric Smith.
Donald Zuber, Baton Rouge, for defendant/appellant Edgar Wyman Walker, Jr., M.D.
Before WHIPPLE and KUHN, JJ., and CHIASSON[1], J. Pro Tem.
KUHN, Judge.
Plaintiff, Eric Smith, filed this suit for damages against Edgar Wyman Walker, Jr., M.D., a family medicine physician who treated Smith for back and hip injuries sustained in an automobile accident. Plaintiff alleged that: 1) following the accident, Walker treated him for approximately two months; 2) during that time and at Walker's direction, he underwent a CT scan, which revealed a herniated L4-5 disc; 3) although Walker examined him after the CT scan was performed, Walker failed to discuss with him the findings of the CT scan; 4) because Walker failed to advise him of the disc injury, he settled his personal injury suit against the owner, operator and insurer of the vehicle involved in the automobile accident for an amount of funds substantially less than the available policy limits; 5) he would not have settled his personal injury suit in that manner if he had been aware of the seriousness of his injury; and 6) Walker's failure to disclose the disc injury caused plaintiff to sustain damages. The trial court signed a judgment in favor of plaintiff and against defendant in the amount of $47,500.00. Defendant has appealed. We affirm the trial court's judgment.
On appeal, we address whether: 1) Smith relinquished his rights to pursue a claim against Walker based on the terms of a release; 2) the duty to properly diagnose or inform a patient of a serious medical condition encompasses the risk that the patient may enter into a settlement with a third *799 party for an inadequate sum of money when the settlement is based on inaccurate information; and 3) Smith proved that Walker's failure to inform him of a serious medical condition caused damages in the amount of $47,500.00.

I. FACTS
On July 22, 1991, an automobile accident occurred involving plaintiff's vehicle and another vehicle driven by Gilbert C. Woods. Following the accident, Smith experienced pain in his lower back, left hip and upper left thigh. When Smith was initially treated by Walker on July 25, 1991, he related his physical complaints to the automobile accident. Following a physical examination and x-ray examinations, Walker diagnosed Smith as suffering from a lumbosacral sprain and strain, and a sprain and strain of the left hip. Walker treated Smith conservatively, prescribing muscle relaxants and diathermic treatments, which use electromagnetic sound waves to heal traumatized areas. When Walker examined Smith again on August 1, 1991, Smith complained of muscle spasms in his lumbosacral spine and tenderness in his left hip. Diathermic treatments were continued. During Smith's August 7, 1991 examination, he reported improvement of his symptoms, but continued to have pain in his lower back and left hip. On August 16, 1991, Smith continued to complain of pain in his lower back and left hip. Walker's examination revealed muscle spasms, limitation, tenderness of the lumbosacral spine, and tenderness with limitation in the left hip. Based on a questionable positive straight leg test, which Walker thought could be indicative of a lumbosacral disc problem, he arranged for Smith to have a CT scan of his spine at a diagnostic center. The results of the CT scan, performed on August 23, 1991, indicated Smith had a prominent disc herniation at L4-5 and a moderately advanced degree of spinal stenosis.
Smith returned to Walker's office for diathermic treatments on August 26, 1991, and on August 29, 1991. He was not seen by Dr. Walker when he received these treatments. Walker's next examination of Smith following the CT scan was on September 3, 1991. Smith reported he was somewhat better but that his left hip and thigh continued to hurt. Walker again found tenderness with limitation and muscle spasm on the left side of the spine with some limitation of motion in the left hip. Walker acknowledged that he had received the results of the CT scan as of the September 3rd visit, but stated he had no indication in his records regarding whether he had discussed the results of the CT scan with Smith. However, Walker testified that to the best of his recollection, he had informed Smith of the results of the test during that visit.
Smith returned for additional diathermic treatments during September and was next seen by Walker on September 9, 1991. Because Smith reported very little pain, Walker recommended that Smith return in three weeks, and informed Smith that if he returned without any symptomatology, he would be discharged. Walker discharged Smith from his care on September 26, 1991; Smith had no complaints and his physical exam was normal.
Walker testified that even though Smith had a ruptured disc, it was not unusual that he had experienced some relief from his pain as a result of the conservative treatment he received. Walker explained that he provides conservative care for patients suffering from a ruptured disc depending on the symptomatology presented, and that his practice did not involve invasive procedures such as surgery. If the symptomatology persists despite conservative care, he refers the patient to a neurosurgeon for surgery. Walker elected to treat Smith conservatively, since he was not complaining of severe pain.
In another proceeding, Smith filed suit against Woods and State Farm Mutual Automobile Insurance Company ("State Farm"), Woods' liability insurer, alleging the automobile accident was caused solely by the negligence of Woods. Smith alleged he sustained property damage and injuries as a result of this negligence. Ms. Charlotte Pharaon, employed by State Farm as a claims specialist, handled Smith's claim against State Farm's insureds, Gilbert and Teresa Woods. She explained the policy limits on the coverage in effect was fifty thousand ($50,000.00) dollars *800 per person, one hundred thousand ($100,000.00) dollars per accident, and fifty thousand ($50,000.00) dollars for property damage. State Farm determined its insureds were liable, and Pharaon advised Smith to contact her when he had been discharged by his doctor.
As of October 15, 1991, Smith had submitted a claim for medical expenses in the amount of $1,620.70, and a claim for lost wages of $184.00, totaling $1,804.70. When Pharaon offered to settle the claim for these special damages and an additional $2,000.00, Smith countered requesting that he be paid $4,500.00, plus his special damages. On October 31, 1991, Smith executed a written release (without being represented by legal counsel), settling the claim for $6,008.61. Pharaon explained this amount represented $4,304.70, for the bodily injury portion of the settlement ($2,500.00 for general damages, plus $1,804.70 for special damages), and $1,703.91 for property damage and car rental fees.
Pharaon testified that she assumed Smith had been released from medical care when the settlement was executed. Her settlement offers were based on her evaluation of Smith's injury as a two-month, soft-tissue injury. Although State Farm had paid for the CT scan ordered by Walker, Pharaon did not seek medical authorization to review Dr. Walker's records. She stated that the claim would have been handled differently had she know that Smith's injury involved a ruptured disc. She testified that the amount paid for an operated lumbar disc would more likely than not have exceeded the $50,000 policy limits available to Gilbert Woods under the State Farm policy. She could not estimate how much would have been paid for a herniated disc, which had not been corrected by surgery.
Pharaon estimated that during 1991, her authority to settle was about $5,000.00 per person. As of 1996, her authority had been increased to $7,500.00 per person. If a proposed settlement figure exceeds her authority, she must get approval from her supervisor, who also has limits on his authority. At the time of the 1991 settlement with Smith, Mr. John C. Ozier, a resident claim superintendent, was Pharaon's supervisor. Pharaon believed his authority to settle a claim was $25,000.00 per person. If Ozier needed additional funds to settle a claim, he was required to obtain proper authorization from his supervisor. Pharaon testified that if she had known that Smith had a ruptured disc, she would have immediately discussed the file with her supervisor to obtain proper authority to settle the claim, whether it came from him or his supervisor. Pharaon did not know the exact amount of authority that would have been extended to her to settle Smith's claim.
On July 21, 1992, Smith returned to Walker complaining of severe lower back pain radiating down the entire left leg. Walker determined the herniated disc had flared up and referred Smith to Dr. Anthony S. Ioppolo, a neurosurgeon. On July 23, 1992, Dr. Ioppolo ordered an MRI examination, which revealed that the disc herniation at L4-5 had progressed in degree, or gotten worse, since the August 23, 1991 scan. Smith was later seen by another neurosurgeon in Ioppolo's group, Dr. Thomas B. Flynn, M.D., on July 30, 1992. Based on the MRI and Smith's progressive symptoms, Flynn recommended surgical intervention to correct the disc. Smith was treated with anti-inflammatory medication until the surgery was performed on February 16, 1993. Flynn testified that following this type of surgery a patient typically will be very limited in his activities for three to six weeks. For the next six weeks, the patient's activities will increase. After twelve weeks, the patient generally can return to normal activity depending on his occupation.
At the time of the surgery, Smith had been working in a department store as a shoe salesman. Approximately seven weeks following the surgery, Smith was doing well and was advised by Flynn that he could return to work when he felt able. Six weeks later, Flynn provided Smith with a note indicating he could work but should not lift anything over twenty-five pounds. Flynn testified that five months post-surgery, Smith was doing well and having very little difficulty. Flynn asked Smith to return on the one-year anniversary of his surgery. At this time, *801 Smith requested permission to continue light-duty work.
Based on Smith's history of no prior significant back difficulty or leg pain and the onset of symptoms following the accident, Flynn concluded that the automobile accident was responsible for the disc protrusion and the related symptoms of back and leg pain.
Smith testified that during his initial office visit, he informed Walker that he had been involved in an automobile accident and that the insurance company would take care of his medical expenses. According to Smith, when he returned to see Walker after the CT scan had been performed, Walker did not inform him of the test results. Smith testified that during the time that Walker treated him, Walker did not inform him the August 1991 CT scan revealed a herniated disc. Smith also stated that when he was discharged by Walker on September 26, 1991, Walker had not discussed with him what type of back problems he could expect in the future. Smith acknowledged that he did not inquire about the results of the CT scan.
When Smith negotiated the settlement with State Farm, he understood the nature of his injury to be a soft-tissue injury. He testified that although he was still experiencing some discomfort in his lower back and his left thigh when Walker discharged him, he relied upon Walker's diagnosis of a sprain and strain when he settled his claim with State Farm. He explained that if he had known that the August 23, 1991 CT scan reflected a ruptured disc at L4-5, he would have informed Pharaon of his medical condition, and he would not have settled his personal injury claim for $2,500.00, plus medical specials.
Smith testified that he did not learn of the severity of his injury until he was referred to Dr. Ioppolo's medical group during July of 1992. When Dr. Flynn advised him of the results of the testing performed on July 24, 1992, he was also advised that the August 23, 1991 CT scan showed the L4-5 disc herniation.
Although the February 1993 surgery relieved Smith's pain, he continues to have some tightness in his back. He testified he cannot run "to full capacity" as he could before the accident, and he cannot lift more than sixty pounds. While recovering from the surgery, Smith missed about two months of work. Prior to the surgery, he had been working on a commission basis, earning pay which equated to an hourly rate of more than $10.00 per hour, and he had been working thirty-eight to forty hours per week.

II. ASSIGNMENTS OF ERROR
On appeal, Walker asserts the trial judge erred: 1) in finding that a physician's duty to properly diagnose or inform the patient extends to include the risk that the patient may settle a lawsuit with a third party for less than he could receive otherwise; 2) in finding that plaintiff met the burden of proof required for proving the elements of causation and damage; and 3) in failing to grant his motion for directed verdict "based upon the settlement and release ... [by Smith] of the original tort-feasor."

III. ANALYSIS

A. Release
The release executed by Smith on October 31, 1991, provides, in pertinent part:
For the Sole Consideration of Six Thousand Eight and 61/100 Dollars, ... the undersigned hereby releases and forever discharges Gilbert Woods, Teresa Woods and State Farm Mutual Automobile Insurance Company, Their heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable or, who might be claimed to be liable, ... from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, and particularly on account of all injuries, known and unknown, both to person and property, which have resulted or may in the future develop from an accident which occurred on or about the 22nd day of July, (year) 1991 at or near Baton Rouge, EBRP, La.
This release expressly reserves all rights of the parties released to pursue their legal remedies, if any, against the undersigned, their heirs, executors, agents and assigns.
*802 Based on the language of the release, Walker contends that Smith relinquished his rights to pursue a claim against him for any causes of actions arising out of the July 22, 1991 accident. Smith asserts the release is unambiguous and should not preclude his claim against Walker.
Pursuant to the terms of the release agreement, Smith and State Farm entered into a transaction or compromise. The codal articles governing transaction and compromise are set forth in La.C.C. art. 3071 through 3083. La.C.C. art. 3071 defines a compromise as "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." La.C.C. art. 3078 addresses the effect of a compromise, stating that a compromise has the legal efficacy of a judgment, possessing "a force equal to the authority of things adjudged," and that a compromise "can not be attacked on account of any error in law or any lesion." Brown v. Drillers, Inc., 93-1019, p. 5-6 (La.1/14/94), 630 So.2d 741, 747.
In the present case, defendant asserts the release instrument in the same manner as a judgment is asserted to support an exception of res judicata. Thus, defendant bears the burden of establishing the requisites for a valid compromise, including the intent to settle the differences being asserted in the action in which it is interposed. Id., 93-1019 at p. 6, 630 So.2d at 747.
A compromise instrument is the law between the parties and must be interpreted according to the intent of the parties to the agreement. The compromise instrument is governed by the same general rules of construction applicable to contracts. Ortego v. State, Dept. of Transp. and Dev., 96-1322, p. 7 (La.2/25/97), 689 So.2d 1358, 1363. Accordingly, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.C.C. art. 2046.
La.C.C. art. 3073, which sets forth a supplementary rule of construction governing the interpretation of the operative language, and the determination of the scope, of a compromise agreement, provides in pertinent part as follows:
Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
In determining those matters the parties intended to settle, we must consider the contract as a whole and in light of attending events and circumstances. Ortego v. State, Dept. of Transp. and Dev., 96-1322 at p. 7, 689 So.2d at 1363. Thus, the intent which the words of the compromise instrument express in light of the surrounding circumstances at the time of execution of the agreement is controlling. Brown v. Drillers, Inc., 93-1019 at p. 8, 630 So.2d at 748.
In the instant case, Walker relies solely on the language of the release instrument; he does not assert that extrinsic evidence should be considered in determining the intent of Smith and State Farm upon executing the release. Thus, the case turns strictly on an interpretation of the intent of these parties as reflected in the release instrument.
The issue presented is whether the language employed in the release instrument reflects that Smith and State Farm clearly comprehended, in light of the surrounding circumstances, a release of claims by Smith against Walker. Applying La.C.C. art. 3073, we conclude that the language of the release agreement executed by Smith does not show a clear intention to release any potential negligence claims he may have had against Walker with respect to the treatment rendered following the July 22, 1991 automobile accident. Walker was neither a party to the release document nor was he a party to the litigation at the time the release was executed. Moreover, Smith was not aware that Walker had failed to disclose a significant *803 medical diagnosis to him at the time the release was executed. In fact, Smith's damages, and resulting claim against Walker, did not arise until the settlement was actually executed. No claims had been asserted by Smith against Walker prior to the time that the release was executed (and since Smith did not actually incur damages resulting from Walker's failure to inform until the release agreement was executed), the parties clearly did not contemplate that any claims against Walker were compromised pursuant to the release. Accordingly, we find no merit in Walker's contention that Smith relinquished his right to pursue a claim against him based on the language of the October 31, 1991 release.[2] The trial court properly denied Walker's motion for directed verdict.

B. Duty/Risk
Although plaintiff has categorized this suit as a malpractice suit, defendant points out that the damages plaintiff seeks to recover are "of an economic nature based on settlement of [the] personal injury suit" rather than damages for physical injury or aggravation of a physical injury based upon the medical treatment provided by Walker. We believe the suit is properly categorized as a negligence suit.
In an action to recover damages allegedly caused by another's negligence, a plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989) (on rehearing). The standard negligence analysis employed in determining whether to impose liability under La.C.C. art. 2315 is the duty-risk analysis. Roberts v. Benoit, 605 So.2d 1032, 1041 (La. 1991). Every negligence case must be decided on its own facts and circumstances. Todd v. State, 96-3090, p. 7 (La.9/9/97), 699 So.2d 35, 39. For liability to attach, plaintiff must establish that 1) the conduct in question was a cause in fact of the resultant harm; 2) the defendant owed a duty to plaintiff; 3) the duty owed was breached; and 4) the risk or harm caused was within the scope of the breached duty. Fox v. Bd. of Supervisors of Louisiana State Univ. and Agricultural and Mechanical College, 576 So.2d 978, 981 (La. 1991).
Walker does not assign error to the trial court's implicit findings that he had a duty to inform Smith of the results of the August 23, 1991 CT scan, and that he breached this duty by failing to inform Smith that the test revealed a herniated disc.[3] Rather, Walker contends that "his duty to properly diagnose or inform the patient did not extend to the risk that the patient may enter a settlement of a lawsuit with a third party for less than he could have received otherwise...."
The critical inquiry in this duty-risk analysis is whether the risk of Smith entering into a settlement with a third party for an inadequate sum of money due to the settlement being based on inaccurate information is within the ambit of the duty imposed on Walker. The scope of a duty is determined by the ease of association between the duty owed and the risk encountered. Guillory v. Ins. Co. of North America, 96-1084, p. 11 (La.4/8/97), 692 So.2d 1029, 1035.
*804 As noted above, Smith testified that he informed Walker during the initial visit on July 25, 1991, that he had been involved in an automobile accident and that State Farm would pay his medical expenses. Walker's office records reflect that during the time that Walker treated Smith's back and hip injuries, Smith did not make payments on his account. As services were provided to Smith, the charges were added to his account. As of September 26, 1991, the balance on Smith's account was $1,137.00. Walker testified it was a common practice in his office to defer collection of accounts, in some instances, where the medical treatment was provided to a patient who had been injured in an automobile accident.
Because the record establishes: 1) Walker was informed that Smith's injuries resulted from an automobile accident; 2) Smith advised Walker that State Farm would be paying his medical expenses; 3) Walker's business practice was to defer collection on accounts involving a patient who had been injured in an automobile accident; and 4) collection on Smith's account was apparently deferred pending settlement with State Farm, we find Walker's duty to inform Smith of the serious diagnosis of a herniated disc encompassed the risk that Smith would settle an insurance claim for an inadequate sum of money, particularly where Smith had been provided with a diagnosis of a much less severe injury, sprain and strain of his back and left hip. Accordingly, based on the particular facts of this case, we find the record establishes that Smith proved Walker was negligent in failing to communicate that the August 23, 1991 CT scan revealed a herniated disc.

C. Damages
Walker asserts that Smith failed to prove that the damages claimed by Smith were in fact caused by the doctor's failure to inform him of the results of the August 23, 1991 CT scan. Walker contends that because Pharaon testified that the limits of her authority to settle were between $5,000.00 and $7,500.00 (and that other superiors would have been involved if the claim was to be settled for a higher amount), the evidence regarding Smith's damages is speculative at best. Walker urges that Smith settled his claim without the advice of an attorney, and that it "is entirely possible that [Smith] could have ... settled the claim for a greater amount even for a soft tissue injury...." Walker claims that Smith has not established that the $50,000.00 policy limits would have been paid had State Farm been aware of the disc injury.
Much discretion is left to the judge or jury in the assessment of damages in negligence cases. La.C.C. art. 2324.1. When damages are not susceptible of precise measurement, much discretion should be afforded to the trial court for the reasonable assessment of these damages. La.C.C. art. 1999. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Based on the record in its entirety, we find no abuse of the trial court's discretion in awarding damages in the amount of $47,500.00. Smith testified unequivocally that he would not have settled his case for $2,500.00 had he been properly informed about his medical condition. Flynn testified that the automobile accident caused a progressive disc injury and that while conservative treatment temporarily relieved Smith's symptoms, it would not have stopped the progressive protrusion of the disc. Although Pharaon could not speculate what State Farm would have paid to settle a claim involving a herniated disc upon which surgery had not been performed, Pharaon testified that based on her experience, a claim involving a lumbar disc which had been corrected by surgery would have been clearly valued in excess of the $50,000.00 policy limits available under the State Farm policy. She also acknowledged that Smith's claim would have been handled differently had she known of Smith's disc injury. We find the testimony of Pharaon and Smith, along with the medical evidence substantiating the nature of Smith's injury and resulting surgery, is more than sufficient to support the trial court's award.

*805 IV. CONCLUSION
For the above reasons, we affirm the judgment of the trial court awarding judgment in favor of plaintiff and against defendant in the amount of $47,500.00. Costs of this appeal are to be paid by defendant-appellant, Edgar Wyman Walker, Jr., M.D.
AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] We find the present case to be distinguishable from Migliore v. Traina, 474 So.2d 980 (La.App. 5th Cir.1985), cited by appellant. In Migliore, plaintiff, who had been injured in an automobile accident, sought to recover against her uninsured-underinsured (UM) carrier after signing a release with the tort-feasor. She had filed suit initially against the tort-feasor, the tort-feasor's insurer and her own UM carrier. The court found the express language of the release to be unambiguous, and that the language of the release clearly demonstrated the plaintiff's intent to release her own UM carrier. We recognize that the plaintiff had filed suit against the UM carrier (and was clearly aware of the claim against her UM carrier which arose directly out of the automobile accident) prior to the time that she executed the broadly-worded release.
[3] Although Walker does not admit that he failed to inform Smith of the disc injury revealed by the August 23, 1991, CT scan, Walker acknowledged that a ruptured disc is a very serious diagnosis, and that a patient should very definitely be informed of such a diagnosis. Additionally, he acknowledged that a failure to discuss a diagnosis of a ruptured disc with a patient would be a deviation below the standard of care required of family medicine practitioners in the Baton Rouge area.