775 So.2d 492 (2000)
Joseph A. WHITE, III, John L. Monson and Anthony J. Cashiola, Sr.
v.
GENERAL MOTORS CORPORATION, Brockhoeft's Chevrolet, Inc. and Hank's Pontiac-GMC-Buick, Inc.
No. 99 CA 2585.
Court of Appeal of Louisiana, First Circuit.
November 3, 2000.
*493 Davis B. Allgood, Baton Rouge, LA, David G. Radlauer, Thomas A. Casey, Jr., New Orleans, LA, Lee A. Schutzman, Edward C. Wolfe, Detroit, MI, Jeffrey Rosen, Washington, D.C., Counsel for Defendant/Appellant, General Motors Corporation.
Michael G. Crow, Louis C. LaCour, Jr., Karen Lewis, New Orleans, LA, Patrick W. Pendley, Lawrence G. Gettys, Plaquemine, LA, Don Barrett, Lexington, MS, Gordon Ball Knoxville, TN, Richard Alexander, San Jose, CA, Dianne M. Nast, Jeanne L. Rensberger, Lancaster, PA, Elizabeth J. Cabraser, Kelly M. Dermody, Fabrice Vincent, San Francisco, CA, Timothy J. Crowley, Rick Norman, Houston, TX, Sam F. Baxter, McKool Smith, Rosemary Snider, Marshall, TX, Marc R. Stanley, Dallas, TX, Andrew W. Hutton, Wichita, KS, Harry T. Hardin, III, Gretna, LA, Counsel for Plaintiffs/Appellees and the Class.
Daniel E. Becnel, Jr., Reserve, LA, Counsel for Intervenor, Kenneth Hight.
Jack M. Stolier, New Orleans, LA, Joe McCray, San Francisco, CA, Richard Rosenthal, Carmel Valley, CA, Lynde Selden, San Diego, CA, Counsel for Jack French, Robert West, Charles Merritt, Joseph Geller and and Dan Tureck.
Brian Wolfman, Public Citizen Litigation Group, Washington, DC, Counsel for Betty Youngs, Barbara Phillips, Margaret Engel, Larry Swope and Robin Maxwell, Public Citizen, and the Center for Auto Safety.
J. Burton LeBlanc, IV, Jules B. LeBlanc, III, Cameron R. Waddell, Charles S. Lambert, Jr., Baton Rouge, LA, C. Jerome D'Aquila, New Roads, LA, Victor J. Woods, Jr., Baton Rouge, LA, Counsel for the Objectors, Fred T. Butcher, et al.
Robert Leslie Forche, San Antonio, TX, Intervenor/Pro Se.
Anne Crabbe, Chicago, IL, Counsel for Certificate Clearing Corporation.
Jesse Sumner, Bartlesville, OK, Counsel for Consumer Objectors.
Michael Pfundstein, Miami, FL, Counsel for Objector, Darol Carr.
Stephen Gardner, Dallas, TX, Counsel for Center for Auto Safety.
Charles C. Holbrook, Baton Rouge, LA, and Scott A. Johnson, Clyde C. Greco, Jr., Robert B. Gerard, San Diego, CA, Paul G. Borron, III, Plaquemine, LA, Counsel for Jesus Garibay, et al.
BEFORE: GONZALES, PETTIGREW AND ROTHSCHILD,[1] JJ.
GONZALES, J.
In this appeal, General Motors Corporation (GMC) challenges a trial court order *494 requiring implementation of a class action settlement in a manner not set forth in the settlement agreement. GMC contends the trial court order makes impermissible substantive changes to the settlement agreement. The class action plaintiffs contend the trial court order was a proper exercise of the trial court's power to oversee the administration and implementation of the settlement agreement.

FACTUAL AND PROCEDURAL BACKGROUND

General Background
Beginning in 1992, class action lawsuits were filed nationwide against GMC by owners of GMC pickup trucks that had been manufactured with side-mounted fuel tanks located outside of the vehicle frame rails. Although attempts to settle the approximate 5.8 million class claims have been made, thus far, none have been successful. See e.g., In re: General Motors Corporation Pick-up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3rd Cir.1995), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). In 1998, this court vacated a trial court judgment from the Eighteenth Judicial District Court certifying a nationwide settlement class and approving a settlement agreement. White v. General Motors Corporation, 97-1028 (La.App. 1 Cir. 6/29/98), 718 So.2d 480, writ denied, 98-2502, 98-2511, 98-2522 (La.12/11/98), 729 So.2d 587, 590, 591.[2] The matter was remanded to the trial court for further proceedings. On January 15, 1999, the trial court held a hearing, and on January 20, 1999, signed an "Order and Supplemental Findings in Support of Final Order and Judgment," reaffirming (1) its previous certification of the settlement class, (2) its final approval of the proposed settlement, and (3) its awards for attorney fees and costs.[3]

Terms of the Settlement Agreement
Generally, the settlement agreement provides for members of the settlement class[4] to receive a $1,000.00 certificate for each GM pickup truck[5] owned toward the *495 purchase of any new GM vehicle[6] from an authorized GM dealer. The $1,000.00 certificate is valid for 15 months following the mailing of the final notice of the settlement. If the class member has sold his GM pickup truck, he may freely transfer his $1,000.00 certificate to the purchaser,[7] who may use the certificate in the same manner as it could have been used by the settlement class member, provided the purchaser is the current owner of the truck. Following the initial 15 month period, the certificates are usable for additional periods of 18 and 35 months, and for lesser value, depending on whether the settlement class member is a consumer, fleet, or governmental owner.[8]
In lieu of a $1,000.00 certificate, a settlement class member may sell or transfer his entire interest in his certificate, by exchanging the certificate for a $500.00 "third party certificate" that is usable for the unexpired portion of the initial 15 month period by a designated third party toward the purchase of a new GM vehicle, without proof of ownership of a GM pickup truck.[9] To obtain a third party certificate, the $1,000.00 certificate must be sent with a written request that the third party certificate be issued in the name of the designated party, and stating the name and address of the designated third party.
Under the settlement agreement, holders of certificates need not trade in a GM pickup truck in order to use the certificates toward the purchase of a new GM vehicle; nor is a certificate holder required to disclose his intention to use a certificate toward the purchase of a new GM vehicle until he has made his best deal with the dealer. Only one certificate of any kind provided for in the settlement agreement may be applied toward the purchase of each new GM vehicle. Certificates may not be used by authorized GM dealers or their affiliates.
The settlement agreement also provides for the establishment of a safety research project, funded by GMC's payment of $4.1 million, to promote independent research to enhance motor vehicle fuel system safety. Upon the effective date of the settlement, and conditioned upon its continuing performance of all terms and conditions of the settlement agreement, the settlement agreement provides that GMC[10] shall be released from any and all claims brought, or which could have been brought by the settlement class members, arising out of, or in any way relating to the fuel system of the GM pickup trucks containing the side-mounted fuel tanks. The settlement does not preclude the assertion of claims for damages arising out of any vehicle fires or crashes that result in personal injury, death, or physical damage to property.

"Implementation" of the Settlement
After its January 20, 1999 order approving the settlement, the trial court scheduled *496 a hearing to be held on March 22, 1999, "to facilitate implementation of the settlement" and "for the purpose of considering and approving the form of the notice to be disseminated to the class members and such other matters as may be pertinent to implementation of the settlement." At the hearing, the parties entered the following pertinent stipulations: (1) subject to its meeting the lowest bid, Moore Corporation Limited (Moore) would process proofs of claims, issue original certificates, and process requests for and issue third party certificates; and (2) the notice to the settlement class members would include language informing them of their right to sell their certificates to persons of their choice at the best price they could negotiate, would advise the settlement class members that counsel for the plaintiffs (Class counsel) could provide further information and assistance in transferring or selling the certificates, and would provide a toll free number where Class counsel could be reached. The trial court approved the stipulations and adopted them as the order of the court.
On April 1, 1999, the trial court issued an order, amending the stipulation of counsel and its March 22, 1999 oral order. In the April 1, 1999 order, Moore's responsibility was changed to handling the final notice and claim form functions, and the third party certificate functions, but GMC was ordered to select the entity to process requests for, print, and mail the original certificates to settlement class members. In the event Moore did not agree to meet the lowest bid, the order provided the lowest responsible bidder was selected to perform the final notice and claim form functions. Further, the April 1, 1999 order approved the form of the final notice and claim form (a copy of which was attached to the order) for mailing to the settlement class. The approved notice contained the stipulated reference to a toll free number where Class counsel could be reached for assistance in transferring or selling certificates.
On May 14, 1999, Class counsel filed a "Motion for Order Relating to Administration and/or Implementation of Settlement" requesting that the trial court set a hearing to address several issues. Hearings were held and evidence was introduced on May 24, 1999, and June 18, 1999. At the hearings, Class counsel introduced, among other things, a sample of a letter (cash option letter) it sought to have included in the mail-out envelope containing the final notice and proof of claim form to settlement class members.[11] The cash option letter informs the settlement class member that the settlement "provides you with a Certificate for a discount off the purchase price of any new GM light-duty truck or automobile ..., or allows you to transfer your interests in your Certificate to a third party." The cash option letter goes on to inform the settlement class member that, rather than receive a certificate, he may receive a check for $100.00 from an entity identified as "Certificate Redemption Group" (CRG).[12] At the bottom of the cash option letter is a detachable "$100 *497 CASH OFFER" form which allows the settlement class member to receive $100.00 instead of his $1,000.00 certificate as follows:
To receive $100.00 instead of a Certificate, complete, sign and date the "Application for Certificate" and this "Cash Offer", and return this form together with the signed "Application for Certificate" form in the enclosed postage paid reply envelope. I elect to receive $100.00 instead of a Certificate and I hereby irrevocably: (1) instruct that my Certificate be delivered to Chase Bank of Texas, N.A.; (2) acknowledge that I am transferring my entire interest in the Certificate and this Settlement in exchange for a CRG check for $100.00 issued on Chase Bank of Texas, N.A.; and (3) authorize CRG, or its designee, to endorse my Certificate and send me a $100.00 check. (Bolding and underscoring in original.)
Following the May 24, 1999 hearing, counsel for GMC inquired about the existence of any agreements between Class counsel and CRG regarding the cash option being offered to settlement class members in the cash option letter. By letter dated June 8, 1999, Class counsel informed counsel for GMC that CRG had previously agreed to reimburse Class counsel $1.55 million.

Involvement of CRG as a "Market-Maker"
The record indicates Class counsel and CRG have had an ongoing relationship for several years during this class action litigation. In 1995, the Third Circuit Court of Appeals set aside a settlement agreement, similar to that at issue herein, reached in a multi-district litigation proceeding involving the same parties herein, because the settlement was "not fair, reasonable, or adequate." In re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 818 (3rd Cir.1995), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). One of the reasons the settlement was found deficient was due to a lack of proof as to whether a settlement class member's option to transfer his $1,000.00 certificate was of any value. The federal court noted the value of the transfer option depended on the development of a secondary market for the certificates, and that the terms of the then settlement agreement precluded the "development of a market-making clearing house mechanism." Id., 55 F.3d at 809.
When the nationwide litigation was brought to the Louisiana court system, the settlement agreement was revised to increase the transferability of the certificates and to facilitate the development of a secondary market. At a fairness hearing held on November 6, 1996, Class counsel referred to an offer allegedly received by Class counsel from an entity known as "ICMC investors" to purchase all certificates issued within the first 75 days after issuance of the proof of claim for $100.00.[13] Apparently, "ICMC investors" is another name for CRG.
The record does not contain an agreement between Class counsel and CRG regarding the cash option offer.[14] However, by including the cash option letter containing CRG's alleged offer, Class counsel sought to further develop the secondary market by making CRG the court approved "market maker" who would buy the certificates from settlement class members and then market them to willing buyers.
At the June 18, 1999 hearing, GMC rigorously objected to the inclusion of the cash option letter, arguing its inclusion had *498 never been agreed to by the parties, and its inclusion was contrary to the terms of the settlement agreement. GMC argued Class counsel's attempt to include the cash option letter, contrary to the terms of the settlement, was an attempt to financially gain from the agreement with CRG whereby CRG agreed to reimburse Class counsel $1.55 million in conjunction with its role as the market maker.[15]

The "Implementation" Order
On June 21, 1999, the trial court signed an "Order Relating to Class Counsel's Motion and Amended Motion Relating to Administration and/or Implementation of Settlement," (June 21, 1999 order) which forms the basis of GMC's current appeal.[16] The June 21, 1999 order, among other things: (1) approved the format, text, and quality of the envelope to be used for mailing the final settlement notice and proof of claim form; (2) approved the inclusion of a business reply envelope in the mail-out as well as the format and text of the business reply envelope; (3) approved the inclusion of the cash option letter in the mail-out along with the final notice and proof of claim form; (4) directed that Experian, as the lowest bidder, would be responsible for printing and mailing the final notice and related material, for processing proofs of claims and issuing original certificates, and processing requests for and issuing third party certificates; and (5) ordered "GM/Polk" to immediately provide Experian with the necessary database, subject to certain conditions.
In the June 21, 1999 order and in "Findings of Fact" signed the same day, the trial court concluded it had the power to order the relief sought by Class Counsel because the issues addressed in Class Counsel's motion "all clearly relate[d] to the administration and implementation of the Settlement," and because the settlement agreement specifically provided that "the form and content of [this] Notice shall be subject to Court review and approval [...]." (Emphasis in original.)

AUTHORITY OF THE TRIAL COURT TO ORDER INCLUSION OF CASH OPTION LETTER IN FINAL NOTICE MAIL-OUT
In assignment of error number one, GMC contends the trial court erred in *499 ordering GMC to send the cash option letter with the final notice to class members because:
(1) the order improperly changed the parties' settlement agreement, which specifies what the notice is required to do and precludes the cash option letter;
(2) the cash option letter conflicts with the requirements in the settlement agreement for the issuance and exchange of settlement certificates, and the trial court's order rewrites the settlement agreement to accommodate the terms of the cash option letter;
(3) the order is an improper substantive modification of the final judgment that approved the settlement without a cash option letter;
(4) the parties had agreed in their March 22, 1999 compromise that GMC did not have to send the cash option letter; and
(5) the record shows the trial court made no attempt to analyze the propriety of the cash option letter or Class Counsel's self-dealing and conflicts of interest, and the record does not support a finding that the order was justified.

Applicable Legal Principles
The authority of the trial court to order the inclusion of the cash option letter in the final notice mail-out is governed by the terms of the settlement agreement itself and Louisiana laws regarding compromise and class action settlements.
Under Section VII.7 of the settlement agreement, the final notice to be mailed to settlement class members was to inform them that the court had given final approval to the settlement agreement and "explaining the procedure and providing Proof of Claim forms for SETTLEMENT CLASS members to obtain Certificates." Further, Section VII.7 provides, "[t]he form and content of this Notice shall be subject to court review and approval at the request of either General Motors' Counsel or CLASS COUNSEL." Additionally, Section XI.4 of the settlement agreement states that the trial court "retain[s] continuing and exclusive jurisdiction over the parties hereto, including all members of the SETTLEMENT CLASS, and over the administration and enforcement of the Settlement and the benefits to the SETTLEMENT CLASS hereunder." These provisions clearly indicate the trial court had authority to oversee the implementation of the mail-out of the final notices for the settlement.[17]
However, the trial court's authority to review and approve the form and content of the final notice, as well as its continuing jurisdiction over the administration and enforcement of the settlement agreement, is not without limits. Section XI.1 of the settlement agreement provides that it "and its attachments shall constitute the entire Agreement of the parties and shall not be subject to any change, modification, amendment, or addition without the express written consent of counsel on behalf of all parties to the Agreement." Further, a settlement, or "transaction or compromise" as referred to in civilian terms, regulates only the differences that appear clearly to be intended by the parties, and does not extend to differences that the parties never intended to include in the settlement. La. C.C. arts. 3071, 3073. A settlement agreement is the law between the parties and must be interpreted according to their intent. Smith v. Walker, 96-2813 (La.App. 1 Cir. 2/20/98), 708 So.2d 797, 802, writ denied, 98-0757 (La.5/1/98), 718 So.2d 418. The compromise instrument is governed by the same *500 general rules of construction applicable to contracts. Ortego v. State, Department of Transportation and Development, 96-1322 (La.2/25/97), 689 So.2d 1358, 1363. Accordingly, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. In determining those matters the parties intended to settle, consideration must be given to the contract as a whole and in light of attending events and circumstances. Ortego, 689 So.2d at 1363. Thus, the intent the words of the compromise instrument express, in light of the surrounding circumstances at the time of execution of the agreement, is controlling. Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741, 748.

Intent of the Parties as to the Scope of the Settlement Agreement
As indicated, an earlier version of the settlement agreement at issue herein was set aside by the Third Circuit Court of Appeals in In re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3rd Cir.1995), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), due in part to the court's conclusion that, under the terms of the previous settlement agreement, it was possible that certificate holders would be unable to realize any significant value from the transfer option. Id., 55 F.3d at 809. When the settlement was revised and submitted to the Louisiana district court, changes were made to increase the transferability of the certificates. Further, as of the date of the November 6, 1996 fairness hearing, all parties to the agreement knew the trial court was concerned about the transferability of the certificates and the existence of a secondary market, as well as the existence of CRG as the potential market maker.
In its June 21, 1999 findings of fact, the trial court concluded the inclusion of the cash option letter and $100.00 offer were "critical to the development of a secondary market." Although it may be true that the inclusion of the cash option letter would enhance the development of the secondary market for the certificates, the fact remains that CRG's participation in the certificate redemption process as the "court approved" market maker offering settlement class members a cash option was not addressed in the settlement agreement. If the parties would have agreed to the alternative cash option as opposed to the issuance of certificates, it would have been in the settlement agreement. The record clearly indicates GMC agreed to include language in the final notice informing settlement class members that Class Counsel could provide further information and assistance in transferring or selling their certificates and providing a toll free telephone number where Class Counsel could be reached. However, an agreement to include a telephone number is not an agreement to include a letter offering settlement class members a cash option rather than a certificate. The plain words of the settlement agreement, as well as the background and events surrounding the settlement agreement, indicate there was no such agreement between the parties. The fact that the settlement agreement does not specifically preclude the cash option letter is not an indication that the inclusion of the cash option letter was agreed upon.
The plaintiffs argue the trial court's June 21, 1999 order was a proper exercise of its authority to review the "form and content" of the final notice under Sections VII.7 and XI.4 of the settlement agreement. They contend the settlement agreement lacked "detailed protocol establishing [the] actual mechanisms governing certificate requests, redemptions, and transfers." In support of this argument, plaintiffs refer to a sentence in Section III.D of the settlement which provides that settlement class members "may sell or transfer their entire interest in any or all of their Certificates." When read in isolation, this sentence indeed provides no *501 mechanism dictating how the sale or transfer would occur. However, the remainder of Section D clearly sets forth the mechanism to be used "[i]n the event of such a sale or transfer." And although the mechanism set forth in Section D does not preclude the participation of a market maker in the certificate redemption process, it plainly does not envision the inclusion of a cash option letter in the final notice mail-out, authorizing a market maker's cash option offer to become a court approved alternative to GMC's issuance of certificates to the settlement class members. Thus, the trial court's authority to review the "form and content" of the final notice did not extend to the issuance of an order that changed the terms of the settlement agreement. Under Section XI.1 of the settlement agreement, "any change, modification, amendment, or addition" could only occur with "the express written consent of counsel on behalf of all parties" to the settlement agreement. Such consent was not given in this case. As noted by the United States Supreme Court, "the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." Evans v. Jeff D., 475 U.S. 717, 726, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986).
Therefore, because the trial court exceeded its authority, the June 21, 1999 order must be reversed to the extent it requires the inclusion of the cash option letter in the final notice mail-out.[18]

TRIAL COURT'S AUTHORITY TO SELECT EXPERIAN, INC. TO PERFORM FINAL NOTICE AND CLAIM FORM MAIL-OUT FUNCTION
In assignment of error number three, GMC contends the trial court erred in selecting an entity known as Experian to perform the final notice/claim form mail-out function for the settlement of the class action claims.
According to the settlement agreement, entities other than the parties would be involved in steps necessary to implement the settlement. Under Section VII.2(d), the preliminary notice of settlement was to be printed and mailed to the settlement class by entities selected by GMC; under Section III, an entity or entities selected by Class Counsel and GMC, subject to court approval, would receive proofs of claims from settlement class members and issue certificates (original certificate function); under Section III.D, an entity or entities selected by Class Counsel and GMC, and approved by the court, would process third party certificate requests (third party certificate function); and under Section VII.7, the entity or entities selected to print and mail the preliminary notice (as provided in Section VII.2(d)) would also print and mail the final notice of settlement (final notice/claim form function).
On March 22, 1999, the parties stipulated in open court that Moore would perform the original certificate function and the third party certificate function, subject to its meeting the lowest responsible bid requirements. No mention was made of the final notice/claim form function at the March 22, 1999 hearing. The trial court approved the stipulation and adopted it as the order of the court.
On April 1, 1999, the trial court issued an order, amending the stipulation of counsel and its March 22, 1999 oral order. In the April 1, 1999 order, Moore's responsibility was changed to handling the final notice/claim form function, if it were able *502 to meet the lowest responsible bid, and the third party certificate function, but GMC was ordered to select the entity to perform the original certificate function. In the event Moore did not agree to meet the lowest bid, the April 1, 1999 order provided the lowest responsible bidder was selected to perform the final notice/claim form function.
On June 10, 1999, Class Counsel notified the trial court and other counsel by telecopy transmission that Moore was "no longer willing to perform any of the [mail-out] functions." At the June 18, 1999 hearing, Class Counsel offered into evidence a letter dated June 17, 1999, from Steve Elliott, National Vice President of Sales for Experian, in which Mr. Elliott confirmed "Experian's in-house capabilities to produce the Final Notice/Application for Certificate Mailing in connection with the GM C/K Pick-up Truck Settlement." Mr. John Jira, an Experian employee, also testified at the hearing. Mr. Jira testified Experian was capable of handling all three of the mail-out functions required by the settlement agreement.
In its June 21, 1999 order, the trial court ordered that Experian was chosen to perform the final notice/claim form function, the original certificate function, and the third party certificate function. The trial court further ordered GMC to mail the final notice/claim form "through Experian, having met the low bid requirement." In its June 21, 1999 findings of fact, the trial court stated the following regarding the replacement of Moore with Experian:
8. The Court, acknowledging that its order of April 1, provided, that if Moore agreed to meet the lowest responsible bid, was selected for the [final notice/claim form function]. The Court was advised that, although, Moore met the terms of the lowest responsible bid, it chose to withdraw its bid on Thursday, June 10, 1999. Class Counsel proposed the substitution of Experian for Moore in its proposed order of Thursday, June 17, 1999. In light of Experian's willingness to match Moore's previous low bid, execute any "typical limitation" agreement with Polk in connection with the use of Polk's data and Experian's willingness to accomplish the mail-out within 14 to 21 days of the execution of the [June 21, 1999] Order, the Court finds that Experian should be substituted to perform the [final notice/claim form] function as set forth in the Order of April 1.
GMC argues the trial court erred in approving Experian to perform the final notice/claim form function, because the April 1, 1999 order specifically provided that "the lowest responsible bidder" would perform the final notice/claim form function in the event Moore did not meet the lowest responsible bid. Although there is no proof in the record to support its claim, GMC, in brief, contends an entity known as Communications Concepts, Inc. was the lowest responsible bidder. The plaintiffs argue the trial court had the authority to resolve the dispute regarding the choice of the entity for the final notice/claim form function under Section VII.2(d) of the settlement agreement, which provides "[a]ny dispute regarding the entities selected to print and mail the Notice shall be resolved by the Court...."[19]
We conclude the trial court impermissibly ordered Experian to perform the final notice/mail-out function. The April 1, 1999 order specifically provided that "if [Moore] does not agree to meet the lowest responsible *503 bid for the [final notice/claim form] function in the Agreement, the lowest responsible bidder is selected for that function...." Therefore, the trial court was bound to enforce its previous order. Even if the settlement agreement conferred upon the trial court the authority to resolve disputes regarding the entity chosen to print and mail the final notice/claim form function, the April 1, 1999 order indicated there is no dispute to be resolved that is, upon Moore's default, the order stated "lowest responsible bidder is selected for that function."
In light of the trial court's April 1, 1999 order requiring that the final notice/claim form function be performed by the lowest responsible bidder, we conclude the trial court erred in approving Experian to perform the final notice/claim form function, and the order will be reversed in this regard.

TRIAL COURT'S AUTHORITY TO ORDER "GM/POLK" TO PROVIDE INFORMATION TO EXPERIAN
In assignment of error number two, GMC contends the trial court erred in ordering "GM/Polk"[20] to "immediately provide Experian with the necessary database, subject to Experian's acquiescence to the `typical limitations', to accomplish the [final notice/claim form] mail-out." In resolving assignment of error number three, we determined the trial court impermissibly approved Experian to perform the final notice/claim form mail-out function for the settlement of the class action claims. Therefore, we further conclude the trial court erred in ordering that any information be provided to Experian. The trial court's order to the contrary will be reversed.

DECREE
For the foregoing reasons, the June 21, 1999 order of the trial court is REVERSED IN PART and REMANDED. It is REVERSED insofar as it: (1) orders the inclusion of the cash option letter in the final notice/claim form mail-out, and (2) orders Experian to perform the final notice/claim form function, and (3) orders "GM/Polk" to provide Experian "with the necessary database, subject to Experian's acquiescence to the `typical limitations', to accomplish the [final notice/claim form] mail-out." This matter is REMANDED to the trial court for further proceedings consistent with this opinion.[21]
Costs of the appeal are to be shared equally by plaintiffs and GMC.

*504 APPENDIX A

*505 
*506 
*507 
*508 
*509 
*510 
*511 
*512 
*513 
*514 
*515 
*516 
*517 
*518 
*519 
*520 
*521 
*522 
*523 
*524 
*525 
*526 
*527 
*528 
*529 
*530 
*531 
*532 
*533 

*534 EXHIBIT A

*535 
*536 

*537 EXHIBIT B

*538 
*539 
*540 

*541 EXHIBIT C

*542 

*543 EXHIBIT D

*544 
*545 
*546 
*547 
*548 
*549 
*550 
*551 

*552 EXHIBIT E

*553 
*554 
NOTES
[1] The Honorable Walter J. Rothschild, Judge, Twenty-Fourth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The history of how the nationwide class action settlement ultimately came to the Louisiana court system is set forth in In Re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 134 F.3d 133, 138-139 (3rd Cir.1998), and in White, 718 So.2d at 482-486.
[3] We note that the fairness of the settlement agreement to the settlement class members and the awards for attorney fees and costs are not at issue before this court.
[4] The "settlement class" is defined in the settlement agreement as "All CONSUMERS, FLEETS and GOVERNMENTAL ENTITIES who purchased in the United States and are owners as of 12:01 AM, July 4, 1996, of one or more GM PICKUP TRUCKS." The settlement agreement does not bind persons or entities who submit a request for exclusion from the settlement class within the proper time. The settlement agreement further provides the following pertinent definitions:

"CONSUMER" shall mean any SETTLEMENT CLASS member owning one or two GM PICKUP TRUCKS and shall include any parent, child, sibling or spouse of a CONSUMER, who is residing within the same household as the CONSUMER at the time the CERTIFICATE is used.
"FLEET" shall mean any SETTLEMENT CLASS member which is either a person or entity owning three or more GM PICKUP TRUCKS, except a GOVERNMENTAL ENTITY or the United States government.
"GOVERNMENTAL ENTITY" shall mean any governmental unit, including, but not limited to cities, states, counties, parishes, municipalities, townships or any subdivisions or agencies thereof, and shall also include any governmental unit known by any other name, regardless of the number of GM PICKUP TRUCKS owned, except for the United States government.
[5] The settlement agreement defines "GM PICKUP TRUCK[S]" as:

(i) 1973 through 1986 model year General Motors full-size pickup truck or chassis cab models of the "C" or "K" series which include the following models: Chevrolet C10, C20, C30, K10, K20, K30 and GMC Truck C1500, C2500, C3500, K1500, K2500, K3500, and
(ii)1987 through 1991 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series, which include the following models: Chevrolet R10, R20, R30, R2500, R3500, V10, V20, V30, V2500, V3500 and GMC Truck R1500, R2500, R3500, V1500, V2500 and V3500. GM Pickup Trucks that have been scrapped are not included.
[6] The settlement agreement defines "NEW GM VEHICLE" as:

any new and unused General Motors light truck or automobile, which include[s] Chevrolet, Geo, GMC Truck, Buick, Oldsmobile, Pontiac and Cadillac models. NEW GM VEHICLE shall not include Saturn models or electric powered vehicles.
[7] The "purchaser" may not include "an authorized General Motors dealer or its affiliated entities."
[8] The details of the benefits to the class members are set forth in Section III of the settlement agreement, titled Benefits to Settlement Class Members." The entire settlement agreement is set forth in Appendix A to this opinion.
[9] When combined with any GM rebate and/or discount, the third party certificate is worth $250.00, rather than $500.00.
[10] The settlement agreement indicates that the release from liability applies to GMC, as well as "its present or former officers, directors, employees, agents, attorneys, heirs, executors, administrators, successors, reorganized successors, assigns, subsidiaries, affiliates, parents, divisions, predecessors, and authorized dealers."
[11] As represented by Class counsel at the hearing, a group of Class counsel proposed to pay the costs of the inclusion of the business reply envelope and the cash option letter in the mail-out.
[12] At the May 24, 1999 hearing, the cash option letter introduced into evidence provided the cash option was worth $88.00. However, at the June 18, 1999 hearing, Class counsel substituted the exhibit with another indicating the cash option was $100.00, rather than $88.00. The pertinent language of the cash option letter reads:

For the benefit of Class Members who feel they are unlikely to purchase a new GM vehicle themselves, Class counsel has arranged a court-approved offer for you to sell or transfer your interests in your Certificate. If you exercise the "Cash Option" by XX/XX/XX, you will receive a check for $100.00 from Certificate Redemption Group, L.L.C. ("CRG") issued on Chase Bank of Texas, N.A. ("Chase"). The Certificate will be issued and held in escrow by Chase until funds have been deposited with Chase to pay for your interests in your Certificate.
[13] Although Class counsel refers to an affidavit of William F. Ryan, "one of the principals of ICMC investors," in which details are apparently given regarding this entity's offer to buy certificates, no such affidavit was found in the appellate record.
[14] The record does contain a letter dated May 23, 1999, from James R. Dawley, Manager of CRG, addressed to Mr. Michael G. Crow, in which reference is made to CRG's "proposal to assist Class counsel in making a secondary market in the GM side-saddle class action."
[15] After the federal court set aside the settlement agreement in 1995 in In re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3rd Cir.1995), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995), Class counsel entered into a "Certificate Transfer Agreement" dated October 24, 1996, with the Public Citizen Litigation Group, and its clients, whereby Class counsel agreed to create or stimulate the secondary market for certificates, by placing $10 million of the approximate $24 million attorney fee award Class counsel would receive from GMC into an escrow fund to be used to purchase consumer certificates. The fund was to be used "to the extent that other market makers have not come forward within 180 days after the Settlement becomes final and made irrevocable offers to purchase at least 100,000 certificates." According to Class counsel's June 8, 1999 letter to counsel for GMC, CRG's agreement to reimburse Class counsel $1.55 million was conditioned upon an agreement being reached in connection with CRG's ability to use all or a portion of the $10 million escrow fund to buy the certificates.
[16] When GMC sought to appeal the June 21, 1999 order, the trial court refused to grant a suspensive appeal. GMC sought supervisory writs with this court to stay the proceedings below and to seek a suspensive appeal. On July 15, 1999, this court granted GMC's writ. Joseph A. White, III, et al. v. General Motors Corporation, 99 CW 1599 (La.App. 1 Cir. 7/15/99). (R1104) The ruling stated:

WRIT GRANTED. The trial court's ruling of June 25, 1999, denying [GMC's] motion for suspensive appeal hereby is reversed and judgment is rendered in [GMC's] favor, granting [GMC] a suspensive appeal of all orders issued by the Court on June 21, 1999, upon [GMC's] furnishing legally acceptable security in the amount of $30,000Y. The trial court's June 21, 1999, order is a judgment that is subject to a suspensive appeal. La.Code Civ. P. art. 2083. The case is remanded to the trial court for further action consistent with this ruling.
[17] Current La. C.C.P. arts. 591-597 address the authority of the trial court in class action suits. However, these provisions are only applicable to actions filed on and after July 1, 1997. See 1997 La. Acts No. 839, § 3; Banks v. New York Life Insurance Company, 98-0551 (La.12/7/98), 722 So.2d 990, 993 n. 5. Former statutes addressing class actions did not specifically address the trial court's authority regarding the dissemination, form, and content of a final notice in a class action settlement. See former La. C.C.P. arts. 591-611.
[18] Because we conclude the trial court exceeded its authority by ordering the inclusion of the cash option letter in the final notice mail-out, we need not address GMC's arguments that (1) the parties agreed in a March 22, 1999 compromise that the cash option letter would not be included in the final notice mail-out, and (2) the trial court's failure to "analyze the propriety of the cash option letter or Class counsel's self-dealing and conflicts of interest" supports a conclusion that the June 21, 1999 order was unjustified.
[19] We note the "Notice" referenced in the second sentence of Section VII.2(d) is the preliminary notice to the settlement class members. This notice has already been sent to the settlement class and is not at issue in this appeal. Although Section VII.2(d) specifically gives the trial court authority to resolve disputes regarding the entities selected to print and mail the preliminary notice, it is debatable whether Section VII.2(d) gives the trial court this same authority to resolve disputes regarding the entity chosen to print and mail the final notice.
[20] According to GMC's brief, "The Polk Company" is the entity that developed the "database of potential class members" and that "owned the class mailing list necessary to accomplish the [final notice/claim form] mail-out."
[21] In assignment of error number four and footnote 32 of its brief, GMC contends that each paragraph of the June 21, 1999 order should be vacated because each paragraph constitutes an impermissible change to the settlement agreement. However, the impermissible nature of each paragraph of the order was not briefed by GMC; therefore, to the extent no argument was made regarding a specific paragraph, the assignment of error is considered abandoned. Louisiana Uniform RulesCourts of Appeal, Rule 2-12.4; Devers v. Southern University, 97-0259 (La.App. 1 Cir. 4/8/98), 712 So.2d 199, 207.