835 So.2d 892 (2002)
Joseph A. WHITE, III, John L. Monson and Anthony J. Cashiola, Sr.
v.
GENERAL MOTORS CORPORATION, Brockhoeft's Chevrolet, Inc. and Hank's Pontiac-GMC-Buick, Inc.
No. 2002 CA 0771.
Court of Appeal of Louisiana, First Circuit.
December 20, 2002.
Rehearing Denied February 3, 2003.
*894 Davis B. Allgood, Baton Rouge, David G. Radlauer, Thomas A. Casey, Jr., New Orleans, Lee A. Schutzman, Detroit, MI, Counsel for Defendant-Appellant General Motors Corporation.
Robert A. Vosbein, Sr., Michael G. Crow, William B. Gaudet, William J. Kelly, III, New Orleans, Patrick W. Pendley, Plaquemine, John W. "Don" Barrett, Lexington, MS, Brian Wolfman, Washington, DC, Counsel for Plaintiffs-Appellees Joseph White, et al.
M.F. Baxter, Marshall, TX, Counsel for Appellee Tommy Dollar, et al.
*895 Elizabeth J. Cabraser, San Francisco, CA, Timothy J. Crowley, Houston, TX, Counsel for Appellees Middle District Litigation Plaintiffs.
Dianne M. Nast, Lancaster, PA, Counsel for Appellee John Martin.
Daniel E. Becnel, Jr., Reserve, Counsel for Appellee Kenneth Hight.
Jack M. Stolier, New Orleans, Joe R. McRay, San Francisco, CA, Richard H. Rosenthal, Carmel Valley, CA, Lynde Seldon, San Diego, CA, Counsel for Appellees Jack French, et al.
Charles S. Lambert, Jr., Baton Rouge, Counsel for Appellees Fred Butcher, et al.
Before: PETTIGREW, J., and CIACCIO[1] and PATTERSON,[2] JJ. Pro Tem.
PETTIGREW, J.
In this appeal, General Motors Corporation ("GM") once again challenges a trial court order requiring implementation of a class action settlement. GM asserts that similar to this court's previous opinion in White v. General Motors Corporation, 99-2585 (La.App. 1 Cir. 11/3/00), 775 So.2d 492, on rehearing, 99-2585 (La.App. 1 Cir. 1/16/01), 782 So.2d 9, an order by the trial court makes impermissible substantive changes to the settlement agreement. The plaintiffs in the class action ("settlement class") contend that GM, upon realizing that its class settlement would be too effective at compensating too many settlement class members, now seeks to block an organized secondary market for settlement certificates.

BACKGROUND FACTS[3]
Beginning in 1992, numerous class action lawsuits were filed nationwide against GM on behalf of the registered owners of certain Chevrolet or GMC "C" or "K" series pickup trucks manufactured between 1973 through 1987. The allegations of the various petitions alleged that the pickup trucks at issue were defective in design because the side-mounted fuel tanks were located outside the frame rails of the vehicle making them more susceptible to fuel fires in side-impact collisions.
One of the aforementioned petitions was filed in the Eighteenth Judicial District Court, Parish of Iberville, State of Louisiana. During the pendency of this proceeding, GM removed several similar state actions to federal court. Because of the potential for settlement of the litigation in federal court, the state court proceeding was stayed pursuant to a joint motion. Shortly thereafter, the parties in the federal court action announced a settlement agreement. The settlement class and settlement were later approved; however, several objectors to the settlement appealed. The federal court settlement was later set aside by the Third Circuit Court of Appeal in In re: General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3rd Cir.1995), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) ("GM Truck"). The federal court concluded that the settlement was deficient in part due to a lack of proof as to whether a settlement class member's option to transfer his $1,000.00 certificate was of any value. The federal court noted the value of the transfer *896 option "depends on the development of a secondary market for these certificates." Id., 55 F.3d at 809.
Following the decision in GM Truck, the parties jointly moved to lift the stay in the proceedings in state court in 1996. In response to concerns raised by the federal court in GM Truck (namely, that certificate holders would be unable to realize any significant value from the transfer option), the previous settlement was revised to increase the transferability of the certificates and to facilitate the development of a secondary market. See White v. General Motors Corporation, 99-2585, p. 9 (La. App. 1 Cir. 11/3/00), 775 So.2d 492, 497. On December 19, 1996, the trial court in the Eighteenth Judicial District certified a nationwide settlement class and approved a settlement agreement. The trial court further granted Class Counsel's request for attorneys' fees costs and expenses. Following an appeal to this court, the final order and judgment of the trial court were vacated and the matter was remanded for further proceedings. See White v. General Motors Corporation, 97-1028 (La.App. 1 Cir. 6/29/98), 718 So.2d 480.
On January 20, 1999, three years after negotiating a settlement with GM, the trial court once again certified a nationwide settlement class and approved the settlement agreement. The terms of that settlement agreement are at issue in this appeal.

TERMS OF THE SETTLEMENT AGREEMENT
The settlement agreement provides that members of the settlement class[4] will receive a $1,000.00 certificate (hereinafter referred to as "consumer certificate(s)") for each GM pickup truck owned and these consumer certificates can be applied toward the purchase price of any new GM vehicle from an authorized GM dealer.[5] These consumer certificates are initially valid for 15 months, and during this period, settlement class members may "freely transfer" their $1,000.00 consumer certificates, but only to a member of their household or a subsequent transferee who currently owns the pickup truck identified on the consumer certificate. A transferee cannot be an authorized GM dealer or an affiliated entity.
In the event a settlement class member does not use the consumer certificate to purchase a new GM car or truck, the settlement agreement further provides that within the initial 15-month period, the settlement class member can sell or transfer his entire interest in his original $1,000.00 consumer certificate by exchanging same for a $500.00 "third party certificate." See White, on rehearing, 99-2585 at 2, 782 So.2d at 10. Said "third party certificate" could be used within the unexpired portion of the initial 15-month period by a designated third party who could in turn apply same towards the purchase of a new GM vehicle without proof of ownership of a GM pickup truck.
After the expiration of the initial 15-month period, consumer certificates can be redeemed for lesser value for additional periods of 18 and 35 months depending upon whether the settlement class member is a consumer, fleet, or governmental entity. Settlement class members who are consumers have a total of 33 months to use the consumer certificate. Settlement class *897 members who are consumers will receive $500.00 toward the purchase price of any new GM vehicle from an authorized GM dealer. Alternatively, said consumer certificates are freely transferable following endorsement by the named settlement class member and can only be used by any transferee for $250.00 towards the purchase of a new GM vehicle by the transferee. Thus, after the initial 15 months, the settlement class member is no longer required to exchange the original consumer certificate for a "third party certificate" in order to transfer his or her rights.
The settlement agreement also provides for the establishment of a safety research project funded by GM's payment of a total of $4.1 million in equal installments over three years following the effective date of the settlement. The purpose of the research project was to research, develop, and implement feasible and practical means to enhance fuel system safety in motor vehicles.
The terms of the settlement agreement further provide:
The Court shall retain continuing and exclusive jurisdiction over the parties hereto, including all members of the SETTLEMENT CLASS, and over the administration and enforcement of the Settlement and the benefits to the SETTLEMENT CLASS hereunder. Any disputes or controversies arising with respect to the interpretation, enforcement, or implementation of the settlement must be made by motion to the Court.

PRIOR APPEAL REGARDING IMPLEMENTATION OF THE SETTLEMENT
Following its January 20, 1999 order approving the settlement, the trial court scheduled a hearing for March 22, 1999, to facilitate implementation of the settlement. On April 1, 1999, the trial court issued an order approving the form of the final notice and claim form (a copy of which was attached to the order) for mailing to the settlement class. The approved notice contained a stipulated reference to a toll-free number where counsel for the settlement class ("Class Counsel") could be reached for assistance in transferring or selling consumer certificates.
Pursuant to subsequent motions filed by Class Counsel, the trial court held hearings on May 24, 1999, and June 18, 1999, to address several issues related to administration and/or implementation of the settlement. At the hearings, Class Counsel introduced, among other things, a sample of a "cash option" letter that it sought to have included in the mail-out envelope containing the final notice and proof of claim form to settlement class members. The proposed "cash option" letter included a detachable "$100 CASH OFFER" form that allowed a settlement class member to receive $100.00 in cash as an alternative to GM's issuance of a consumer certificate. Despite GM's vigorous objection, the trial court signed an implementation order on June 21, 1999, which among other things, approved the inclusion of the "cash option" letter in the mail-out along with the final notice and proof of claim form. GM thereafter appealed to this court and challenged the trial court's June 21, 1999 implementation order on the grounds it made impermissible substantive changes to the terms of the settlement agreement. See White v. General Motors Corporation, 99-2585 (La.App. 1 Cir. 11/3/00), 775 So.2d 492, on rehearing, 99-2585 (La.App. 1 Cir. 1/16/01), 782 So.2d 9.
In its opinion prior to rehearing, this court held:
The authority of the trial court to order the inclusion of the cash option letter in the final notice mail-out is governed by the terms of the settlement *898 agreement itself and Louisiana laws regarding compromise and class action settlements.
White, 99-2585 at 12, 775 So.2d at 499.
Noting that a settlement class member's ability to transfer a consumer certificate and the development of a secondary market for these certificates had been a concern throughout this litigation, this court nevertheless held:
If the parties would have agreed to the alternative cash option as opposed to the issuance of certificates, it would have been in the settlement agreement. The record clearly indicates [GM] agreed to include language in the final notice informing settlement class members that Class Counsel could provide further information and assistance in transferring or selling their certificates and providing a toll free telephone number where Class Counsel could be reached. However, an agreement to include a telephone number is not an agreement to include a letter offering settlement class members a cash option rather than a certificate. The plain words of the settlement agreement, as well as the background and events surrounding the settlement agreement, indicate there was no such agreement between the parties. The fact that the settlement agreement does not specifically preclude the cash option letter is not an indication that the inclusion of the cash option letter was agreed upon.
White, 99-2585 at 14-15, 775 So.2d at 500 (Italics contained in original text).
This court further held that Section III.D of the settlement agreement "clearly sets forth the mechanism" to be used in the event settlement class members would desire to sell or transfer their entire interest in any or all of their consumer certificates. White, 99-2585 at 15, 775 So.2d at 501. Section III.D of the Settlement Agreement expressly limits transferability during the first 15 months, and provides that:
In the event of such a sale or transfer, each Certificate may be exchanged for a Third Party Certificate which shall be issued in the name of the person or entity designated on the written request referred to below. The Third Party Certificate may only be used for the unexpired portion of the first 15 months and is not transferable further.
The court further added that:
[A]lthough the mechanism set forth in Section D does not preclude the participation of a market maker in the certificate redemption process, it plainly does not envision the inclusion of a cash option letter in the final notice mail-out, authorizing a market maker's cash option offer to become a court approved alternative to [GM's] issuance of certificates to the settlement class members. Thus, the trial court's authority to review the "form and content" of the final notice did not extend to the issuance of an order that changed the terms of the settlement agreement. Under Section XI.1 of the settlement agreement, "any change, modification, amendment, or addition" could only occur with "the express written consent of counsel on behalf of all parties" to the settlement agreement. Such consent was not given in this case.
White, 99-2585 at 15, 775 So.2d at 501.
The court ultimately concluded that because the trial court exceeded its authority, the June 21, 1999 order would be reversed to the extent it required the inclusion of the cash option letter in the *899 final notice mail-out. Following a subsequent grant of rehearing[6], the matter was then remanded to the trial court for further proceedings.
During the pendency of the above-referenced appeal of the trial court's June 21, 1999 implementation order, the trial court issued an order on March 15, 2000, requiring GM to fund the research project. GM once again appealed claiming that its previously pending appeal had divested the trial court of jurisdiction, and alternatively, that its obligation to fund the research project did not exist until the "effective date" of the settlement. This court held the trial court was divested of jurisdiction only as to the issues contained in the June 21, 1999 order GM previously appealed from; and since the order did not address or adjudicate GM's obligation to fund the research project, the trial court retained jurisdiction over the research project funding issue and did not err in issuing the March 15, 2000 order after the appeal had been granted. This court further held that the effective date of the settlement occurred, and GM's obligation to fund the research project came into existence on November 3, 2000, the date this court partially reversed the trial court's June 21, 1999 implementation order. See White v. General Motors Corporation, XXXX-XXXX, pp. 6-7 (La.App. 1 Cir. 6/22/01), 808 So.2d 722, 725.

THE PRESENT DISPUTE
Following this court's decision on rehearing, Class Counsel and GM began again working towards the mailing of final notice and proof of claim forms to settlement class members. In a letter dated March 6, 2001, Class Counsel advised GM that it interpreted this court's prior ruling as permitting Class Counsel to advise settlement class members through a "1-800" message that settlement class members may instruct an entity known as Experian Information Systems, Inc. ("Experian")[7] to issue consumer certificates in their name and send same directly to Chase Bank of Texas as escrow agent for Certificate Redemption Group ("CRG").[8]
GM asserted that this proposal would violate the terms of settlement agreement, and Class Counsel requested a status conference with the trial court. When the parties failed to reach an accord, GM filed a Motion to Compel Compliance With Settlement Agreement on March 29, 2001. During a hearing before the trial court on April 9, 2001, evidence was introduced on behalf of both parties and the court took the matter under advisement.
On April 18, 2001, GM mailed the final notice of court approval and proof of claim forms to 5.8 million eligible settlement class members who were owners-of-record of the pickup trucks at issue as of 12:01 a.m. on July 4, 1996. The Final Notice included an application to be filled out by *900 members of the settlement class to enable them to receive the Consumer Certificate for $1,000.00 toward the purchase of a new GM vehicle.
On that same date, Class Counsel mailed a separate letter to members of the settlement class that included a detachable form wherein settlement class members who did not intend to purchase a new GM car or truck could take part in a "cash alternative" offer to purchase their consumer certificates. The "cash alternative" plan was reminiscent of the earlier "cash option" plan previously rejected by this court in that it also allowed settlement class members to sell their consumer certificates for $100.00 for a limited time (i.e., 30 days) to CRG. (See Exhibit "J").
Two days later on April 20, 2001, GM supplemented its pending motion seeking compliance with the settlement agreement with an additional memorandum that notified the trial court of the actions undertaken by Class Counsel since the filing of GM's original motion. GM's requests for a ruling from the trial court were unsuccessful.
On April 24, 2001, GM filed a notice of its intention to seek supervisory writs from this court regarding the trial court's failure to issue a ruling in connection with its Motion to Compel Compliance With Settlement Agreement. GM sought a ruling on the merits of its motion, or an order directing that the trial court rule promptly on its motion. Noting that the trial court had not ruled on the pending motion, this court denied GM's writ application as "premature", but directed the trial court to "hear and rule" on GM's pending motion by May 1, 2001.[9]
In a hearing held on April 27, 2001, the trial court considered the motions filed by both parties.[10] On May 2, 2001, the trial court signed an order denying GM's motion, holding that Class Counsel's "cash alternative" plan was valid and consistent with the settlement agreement and prior orders of the courts. The trial court order further directed GM to refrain from communicating its disagreement with Class Counsel's solicitation, except in connection with briefs to this Court.
Pursuant to the "cash alternative" procedures outlined in the trial court's order, Experian, the entity court appointed to issue consumer certificates, will, upon request by a member of the settlement class, issue a consumer certificate in the name of a settlement class member and "make it available to Class Counsel[.]" Class Counsel will purportedly then "take possession" of its clients' consumer certificates and thereafter "transport or ship" the consumer certificates to Rust Consulting, Inc. ("Rust"), a third party contractor.[11] CRG will then market and sell the consumer certificates, and provide Class Counsel with the names of the respective purchasers. Experian will thereafter print and issue the third party certificates in the *901 names of the designated persons or entities provided by CRG.
On April 30, 2001 and May 2, 2001, GM attempted to obtain a suspensive appeal or a stay pending writs from the trial court's May 2, 2001 order. These requests were subsequently denied by the trial court. GM filed another notice of intent to seek writs.
On May 31, 2001, this court stayed "[a]ll proceedings, including the trial court's April 30, 2001 judgment and May 2, 2001 order, and execution of the cash alternative option[.]" White v. General Motors Corporation, 2001-CW-0937 (La.App. 1 Cir. 5/31/2001). Later, on August 24, 2001, this court granted GM's writ application in part, ordering "a suspensive appeal of all orders issued in the trial court's May 2, 2001 judgment, upon [GM's] furnishing legally acceptable security in the amount of $30,000.00[.]" White v. General Motors Corporation, 2001-CW-0937 (La.App. 1 Cir. 8/24/2001). GM timely supplied the security, and the trial court ordered a suspensive appeal on August 30, 2001.

ISSUES PRESENTED FOR REVIEW
In connection with its appeal in this matter, GM assigns the following issues for consideration by this court:
1. Whether the trial court's order ... approving Class Counsel's "cash alternative" violates the Settlement Agreement?
2. Whether the trial court's order ... approving Class Counsel's "cash alternative" violates this Court's prior ruling?
3. Whether the trial court's order is supported by record evidence?
4. Whether the trial court's order... unconstitutionally abridges GM's right to free speech?
5. Whether the trial court's order ... erroneously prohibited GM from modifying its Administrative Dealer Rules which are not part of the settlement?
6. Whether Certificates can be transferred to dealers?
7. Whether Class Counsel's "cash alternative" letter is deceptive?
8. Whether GM is entitled to specific performance of the Settlement Agreement, including the right to injunctive relief prohibiting Class Counsel's breaches and requiring the undoing of the improper actions?
9. Whether Class Counsel failed to comply with Rule of Professional Conduct 1.8?
10. Whether Class Counsel, acting alone or in concert with Experian and/or CRG, may retain, use, or disseminate any list of class members who responded affirmatively to the "cash alternative"?

DISCUSSION

First and Second Assignments of Error
In its first and second assignments of error, GM asks this court to consider whether the trial court's order approving Class Counsel's "cash alternative" violates the settlement agreement or prior rulings of this court.
In its brief to this court, GM argues that the "cash alternative" plan developed by Class Counsel and approved by the trial court is nothing more than a series of elaborate "procedures" primarily designed to circumvent the terms of the settlement agreement and allow "a series of successive certificate transfers that entirely bypass the [settlement] class members to enable the mass sale and resale of Certificates to automotive dealers and fleets." Conversely, Class Counsel contends that GM's objections to the "cash alternative" represent a fabricated attempt to block an organized secondary market by any means.
*902 The present "cash alternative" is akin to the earlier "cash option" in that both proposals allow a settlement class member to receive a check for $100.00 from CRG in lieu of a consumer certificate. In our previous opinion, this court invalidated the "cash option" on the grounds that the parties did not agree to the inclusion of such a letter in the final notice of settlement. See White, 99-2585 at 14-15, 775 So.2d at 500.
Unlike the "cash option" offer previously invalidated by this court, the letter outlining the "cash alternative" was not enclosed in the final notice of settlement. The present "cash alternative" requires settlement class members to make a choice between the issuance of a consumer certificate and participation in the "cash alternative" offer. Under the "cash alternative" plan, settlement class members who wish to accept $100.00 in lieu of a consumer certificate must execute a power of attorney and request that their consumer certificates be turned over to Class Counsel. Said power of attorney authorizes Class Counsel to take possession of settlement class members' consumer certificates and "take any and all action necessary" to sell their consumer certificates. (See Exhibit "J").
Due to the transfer restrictions contained within the settlement agreement and the time limitations of the "cash alternative" offer, settlement class members may not request issuance of a consumer certificate, and following delivery, decide to sell same to CRG. Thus, participation in the "cash alternative" offer would evidently preclude manual delivery or actual physical possession of the settlement certificate by the settlement class member.
The settlement agreement expressly provides in Section III that
Upon receipt of a Proof of Claim form... an entity or entities selected by CLASS COUNSEL and [GM] ... shall issue to each SETTLEMENT CLASS member for each GM PICKUP TRUCK owned a Certificate toward the purchase of any NEW GM VEHICLE purchased from an authorized GM dealer of that line and make subject to the following terms and conditions:
. . .
(Underscoring supplied).
The question of whether the trial court's order approving the "cash alternative" option violated the settlement agreement or prior rulings of this court, hinges upon the effect envisioned by the parties when they approved the language "shall issue to each SETTLEMENT CLASS member" that is contained in the settlement agreement. As this court previously stated:
[T]he trial court's authority to review and approve the form and content of the final notice, as well as its continuing jurisdiction over the administration and enforcement of the settlement agreement, is not without limits. Section XI.1 of the settlement agreement provides that it "and its attachments shall constitute the entire Agreement of the parties and shall not be subject to any change, modification, amendment, or addition without the express written consent of counsel on behalf of all parties to the Agreement." Further, a settlement, or "transaction or compromise" as referred to in civilian terms, regulates only the differences that appear clearly to be intended by the parties, and does not extend to differences that the parties never intended to include in the settlement. La. C.C. arts. 3071, 3073. A settlement agreement is the law between the parties and must be interpreted according to their intent. Smith v. Walker, 96-2813 (La.App. 1 Cir. 2/20/98), 708 So.2d 797, 802, writ denied, 98-0757 (La.5/1/98), 718 So.2d 418. The *903 compromise instrument is governed by the same general rules of construction applicable to contracts. Ortego v. State, Department of Transportation and Development, 96-1322 (La.2/25/97), 689 So.2d 1358, 1363. Accordingly, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. In determining those matters the parties intended to settle, consideration must be given to the contract as a whole and in light of attending events and circumstances. Ortego, 689 So.2d at 1363. Thus, the intent the words of the compromise instrument express, in light of the surrounding circumstances at the time of execution of the agreement, is controlling. Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741, 748.
White, 99-2585 at 13, 775 So.2d at 499-500.
So the question remains: can issuance of the consumer certificate be accomplished with manual delivery made, not to the settlement class member, but to one given his power of attorney?
Black's Law Dictionary (5th ed.1979), defines "issue," in part, as follows:
To send forth; to emit; to promulgate; as, an officer issues orders, process issues from a court. To put into circulation; as, the treasury issues notes. To send out, to send out officially; to deliver, for use, or authoritatively; to go forth as authoritative or binding....
In financial parlance the term "issue" seems to have two phases of meaning. "Date of Issue" when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the term for which they run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery. When the securities are delivered to the purchaser, they will be "issued" to him, which is the other meaning of the term.
In commercial law, means the first delivery of an instrument to a holder or a remitter. [Citation omitted.]
The most closely analogous definition here appears to be the commercial one dealing with the issuance of securities. An incorporeal right manifested in the paper evidencing that right, which is "issued" when the paper (or certificate) is delivered.
The agreement does not define what is meant by "issuance" of a consumer certificate; however, the provisions of the settlement agreement speak alternately of "shall issue to"[12] and "shall be issued in the name of."[13] In the first instance, the cited language appears in Section III of the settlement agreement referring to the initial issuance of the consumer certificates to members of the settlement class. In the latter instance, the quoted language appears in Section III.D of the settlement agreement regarding exchanges of consumer certificates for Third Party Certificates. In our opinion, this distinction was intentional, and not merely coincidental. It is clear from our reading of the settlement agreement that the parties intended for there to be restrictions on the transfer of the consumer certificates at least during the first 15 months, and it is further the opinion of this court that if the parties had intended to allow someone other than a settlement class member to receive the certificates, proper provision would have been made in the settlement agreement. To paraphrase a previous pronouncement *904 of this court, the fact that the settlement agreement does not specifically preclude a member of the settlement class from authorizing Class Counsel to perform transitional functions on his behalf, does not indicate that the inclusion of this alternative was agreed upon by the parties.
Finally, it is the opinion of this court that although the mechanism set forth in Section III may not preclude the participation of a representative or mandatary at some point in the certificate redemption process, it clearly does not envision that within the first 15 months the consumer certificates might be transferred or exchanged without actual receipt by the settlement class member. Thus, the trial court's authority to administer and review the settlement agreement did not extend to the issuance of an order that abrogated the express terms of the settlement agreement.
Therefore, because the trial court exceeded its authority, the May 2, 2001 order must be reversed to the extent it permits a settlement class member, who has not actually received his consumer certificate, to request within the first 15 months, that his consumer certificate be issued and made available to Class Counsel who would be thereafter empowered to designate that it be re-issued in the name of a third person designated by CRG.
However, once the settlement class member has received his consumer certificate pursuant to Section III.D, he may sell or transfer his entire interest in any or all consumer certificates. Specifically, Section III.D provides:
D. Alternatively, CONSUMERS, FLEETS and GOVERNMENTAL ENTITIES with CONSUMER Certificates, FLEET Certificates or GOVERNMENTAL ENTITY Certificates (collectively referred to as "Certificate" or "Certificates") may sell or transfer their entire interest in any or all of their certificates. In the event of such a sale or transfer, each certificate may be exchanged for a third party certificate which shall be issued in the name of the person or entity designated on the written request referred to below. The third party certificate may only be used for the unexpired portion of the first 15 months and is not transferable further. [Emphasis added.]
We have emphasized the word "with" in the above-quoted excerpt from the settlement agreement for the reason that the term "with" implies actual possession of the consumer certificate. Additionally, we can find no language in the settlement agreement that expressly or impliedly prohibits a settlement class member from authorizing Class Counsel to exchange, on the settlement class member's behalf, a consumer certificate for a third party certificate in the name of a designated purchaser. It should be noted that while the process of exchanging a consumer certificate for a third party certificate facilitates the creation of a secondary market as envisioned by the parties and the courts, the right of Class Counsel to exchange a consumer certificate for a third party certificate pursuant to an act of mandate or power of attorney does not arise until after the settlement class member has received the original consumer certificate.
The alternative plan, as ordered by the trial court, is invalid to the extent it allows Class Counsel to perform transactional functions for a member of the settlement class prior to the time the settlement class member receives the consumer certificate. Once the settlement class member has received his consumer certificate, we find nothing in the language of the settlement agreement that would prohibit Class Counsel from performing this transactional *905 function on the settlement class member's behalf.

Third and Seventh Assignments of Error
These assignments question whether the trial court's order is supported by record evidence, and whether Class Counsel's "cash alternative" letter is deceptive. Considering this court has already found merit in GM's assignments of error one and two, it necessarily follows that the trial court's order is not supported by record evidence; and Class Counsel's "cash alternative" letter is deceptive, because it violates the settlement agreement and is contrary to it. These assignments also have merit.

Fourth Assignment of Error
The fourth assignment of error is whether the trial court's order unconstitutionally abridges GM's rights to free speech. In this assignment, GM complains of the following section of the trial court's judgment/order:
GM refrain from communicating that the secondary market is invalid or otherwise beyond the scope of the Settlement Agreement and previous orders of the Courts. However, this does not preclude GM from communicating its contentions or objections made in connection with the appellate process to any third party.
GM contends that this order is a "prior restraint" of its right to free speech. GM urges that the speech sought to be enjoined by the order is not "commercial" speech, proposing a commercial transaction, but rather "content-based" speech or "editorial and historical commentary" on the actions of the courts and litigants; under these circumstances, GM asserts, the court's injunction is subject to strict scrutiny. See CPC International Inc. v. Skippy, Inc., 214 F.3d 456 (4th Cir.2000).
Skippy is a trademark infringement case. Class Counsel somewhat surprisingly cites Gulf Oil Company v. Bernard, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), in which the court upheld an appellate decision finding unconstitutional prior restraint and held the district court had exceeded its authority under Federal Rules of Civil Procedure 23 (relative to class actions) by enjoining parties and counsel from communicating with potential class members in the employment discrimination suit where the record showed no reason necessitating the order. The opinion does not specify what "standards are mandated by the First Amendment" in a class action case, but states that the record should show that "restraint is justified by a likelihood of serious abuses." Id. 101 S.Ct. at 2202.
Class Counsel claims that the "trial court made a record of the particular abuses and the potential confusion which would result from GM's continued media blitzkrieg[.]" Very few references were made to GM's alleged media blitz at the hearing. Class Counsel purported to read "a few quotes from GM's press releases" but then merely stated "the auto maker envisioned a truck owner selling his option to Cousin Ed." A spokesman for GM was identified by name, and Class Counsel averred that GM had "disseminated these lies about the settlement agreement in the press ... [and] tried to sow confusion." (See Exhibit 33). Certainly, it is likely that any announcement by GM that it had doubts about the implementation of the cash alternative would cause confusion among settlement class members who had just received notice about that option from Class Counsel. However, the press releases to which Class Counsel referred to in argument are not appended to their brief, nor do they otherwise appear as exhibits in the documents presented to this court. Based *906 upon the record before us, it would be difficult to say that the trial court established a record showing the restraint ordered in the judgment is "justified by the likelihood of serious abuses." Accordingly, there appears to be merit in this assignment by GM. Therefore, this portion of the trial court's order is reversed, and remanded for further hearings by the trial court to determine whether the restraint is justified by the likelihood of serious abuses.

Fifth Assignment of Error
The fifth error assigned by GM is whether the trial court erroneously prohibited GM from modifying its Administrative Dealer Rules, which are not part of the settlement agreement.
Herein, GM challenges paragraph one of the judgment order: "Any change or proposed change of the GM Administrative Message/Rules previously approved by this Court and modified by the First Circuit Court of Appeal is the law of the case, final, and can only be modified by motion and order of this Court." GM claims that the settlement agreement does not give the trial court authority to approve GM's dealership rules. Class Counsel counters that changes to the dealership rules were previously approved by the trial court and modified by this court thus bringing the rules within the court's review. Further, Class Counsel urges that GM's express displeasure with the current implementation of the settlement agreement requires the court to continue to supervise the situation so that GM does not alter the rules to the detriment of the settlement class members. This section of the order of the trial court enjoining change where no change has been shown to be contemplated may have been premature. In light of the fact that this court is reversing part of the trial court's order, no changes in GM's dealership rules may be necessary. However, considering the trial court's previous involvement in approving changes to these rules and amendment of those orders by this court, the GM dealership rules are subject to court review to insure the proper enforcement of the settlement agreement with the members of the settlement class. Any changes in the dealership rules concerning the honoring of the provisions of the settlement agreement are subject to judicial review. This assignment of error has no merit.

Sixth Assignment of Error
The sixth assignment raised by appellant is whether consumer certificates could be transferred to dealers.
Section III.E.8 of the settlement agreement provides that:
Certificates may not be transferred to authorized General Motors dealers or their affiliated entities during the first 15 months, except that Certificates may be redeemed at authorized General Motors dealers as provided in this Agreement.
GM cites a Class Counsel press release introduced at the April 27, 2001 hearing to the effect that, by mid-May, "dealers, leasing companies, and fleets will be able to access a special Web site ... where [consumer] certificates may be purchased in large quantities." GM contends that Class Counsel intends to have CRG sell consumer certificates to dealers, who will then, presumably, sell or exchange these consumer certificates for third party certificates in the names of actual vehicle purchasers.
First, GM appears to be correct that this scheme would involve two sales of the original consumer certificate; whether or not more than one sale is contemplated in the settlement agreement is debatable. Further, the settlement agreement expressly prohibits the transfer of consumer *907 certificates to GM dealers. GM contends that the trial court erred to the extent it did not prevent this violation from occurring; indeed the judgment does not expressly preclude transference of consumer certificates to dealers. Moreover, paragraph E of the trial court's judgment/order states that "[a] request for Third Party Certificate may be sent to Experian by any person or entity holding a [consumer] Certificate." Class Counsel does not directly address this issue. It is our finding and our opinion that to the extent the judgment allows GM dealers to purchase or obtain consumer certificates, it is in violation of the settlement agreement and must be reversed.

Eighth Assignment of Error
The issue posed by GM's eighth assignment of error is whether GM is entitled to specific performance of the settlement agreement, including the right to injunctive relief prohibiting Class Counsel's breaches and requiring the undoing of the improper actions. The only apparent difference between GM's present request for specific performance of the settlement agreement and its earlier Motion to Compel Compliance, the denial of which gave rise to this appeal, is that GM now seeks to have "Class Counsel pay for undoing what they have already done." As GM did not raise the issue of damages below, the trial court did not have the opportunity to rule on this issue. Accordingly, this assignment is not appropriate for review at this time, and will be remanded to the trial court for resolution after implementation of the judgment of this court.

Ninth Assignment of Error
The ninth error assigned by GM is whether Class Counsel failed to comply with Rule of Professional Conduct 1.8.
GM raised its ethics arguments at the trial court; however, the trial court opined it does not hear questions regarding professional conduct. Indeed, it appears that the appropriate forum in which to raise an alleged violation of professional conduct is through the Attorney Disciplinary Board and Office of Disciplinary Counsel as more specifically set forth under the Louisiana Supreme Court Rules For Lawyer Disciplinary Enforcement. See Supreme Court Rules, Rule 19. Following investigation and review by a hearing committee, a complainant not satisfied with disposition of a disciplinary matter may appeal to a panel of the disciplinary board and ultimately request review by the Louisiana Supreme Court. Supreme Court Rules, Rule 19, Section 30. Accordingly, this assignment is without merit.

Tenth Assignment of Error
The tenth and final error assigned by GM questions whether Class Counsel, acting alone or in concert with Experian and/or CRG, may retain, use, or disseminate any list of settlement class members who responded affirmatively to the "cash alternative". This court has already stated that it could not find any language in the settlement agreement that expressly or impliedly prohibits a member of the settlement class from authorizing Class Counsel to exchange, on the settlement class member's behalf, a consumer certificate for a third party certificate in the name of a designated purchaser provided a consumer certificate has previously been delivered to a settlement class member. Similarly, we find nothing in the settlement agreement that would prohibit Class Counsel, either alone or in concert with Experian or CRG from obtaining lists of settlement class members.
Paragraph III.D of the settlement agreement envisions the creation of a secondary market whereby settlement class members not interested in purchasing a new vehicle may sell or transfer their consumer *908 certificate for a third party certificate to be used for the unexpired portion of the initial 15-month period. If Class Counsel, either alone or in concert with Experian or CRG, were precluded from acquiring a list of settlement class members for the purpose of locating a market maker for a secondary market, such action would, in the opinion of this court, undermine the alternative set forth in paragraph III.D of the settlement agreement. This assignment is without merit.

CONCLUSION
For the foregoing reasons, the trial court's order dated May 2, 2001, is affirmed in part only, insofar as paragraph I of said order. This court has found merit in the first, second, third, fourth, sixth, and seventh errors assigned by GM. For this reason, the remainder of the order dated May 2, 2001 is reversed and this proceeding is remanded to the trial court for further proceedings consistent with this opinion.
The trial court is further ordered to hold a hearing for the purpose of determining an appropriate date for issuance of a new final notice and proof of claim. In furtherance of this order, all time delays set forth in the settlement agreement are suspended and do not run against settlement class members until such time as a date for issuance of a new final notice and proof of claim is selected by the trial court. At this point, the delays set forth in the settlement agreement shall begin to run anew.
Additionally, Class Counsel shall bear all expenses associated with notifying settlement class members of this new final notice and proof of claim. The amount of said expense shall be determined by the trial court.
It is further ordered that settlement class members who have already responded to Class Counsel's offer must be notified of the changes consistent with this opinion by Class Counsel, and Class Counsel shall bear all costs for same.
All costs of this appeal shall be borne by the settlement class.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH ORDER.
NOTES
[1] Judge Philip C. Ciaccio, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Michael A. Patterson is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[3] The history of how the nationwide class action settlement ultimately came to the Louisiana court system is set forth in White v. General Motors Corporation, 97-1028, pp. 3-9 (La.App. 1 Cir. 6/29/98), 718 So.2d 480, 482-486.
[4] The settlement class includes a consumer sub-class, a fleet sub-class, and a governmental sub-class.
[5] The settlement agreement defines "NEW GM VEHICLE" as "any new and unused General Motors light truck or automobile, which include Chevrolet, Geo, GMC Truck, Buick, Oldsmobile, Pontiac and Cadillac models. NEW GM VEHICLE shall not include Saturn models or electric powered vehicles."
[6] White v. General Motors Corporation, on rehearing, 99-2585 (La.App. 1 Cir. 1/16/01), 782 So.2d 9.
[7] In our previous opinion in White, this court ruled that the trial court impermissibly approved Experian to perform the final notice/claim form mail-out function for the settlement of class action claims. This court further concluded that the trial court erred in ordering that any information be provided to Experian. See White, 99-2585 at 18-19, 775 So.2d at 502-503.
[8] A copy of a press release purportedly distributed by Class Counsel and CRG was filed into the record and states that "Houston-based Certificate Redemption Group, LLP ["CRG"], was formed in 1996 for the sole purpose of creating a secondary market for GM certificates in the GM pickup truck class settlement. CRG is the exclusive secondary market maker endorsed and supported by class counsel for the GM ... Full-Size Pickup Settlement."
[9] White v. General Motors Corp., 2001-CW-0855 (La.App. 1 Cir. 4/26/01).
[10] Class Counsel filed a motion entitled "Motion Relating to Administration and/or Implementation of Settlement" on April 25, 2001. (Exhibit 26)
[11] The responsibilities of Rust are unclear. At the April 27, 2001 hearing, Class Counsel described Rust as "the nation's premiere class action administrative service firm." Class Counsel later advised the trial court that Rust would probably staple an original certificate with a request for a third party certificate, send the two together to GM Settlement Headquarters in Young America, Minnesota, where they will be processed and data-inputted and the data would then be transmitted back to Experian where the third party certificate would be created.
[12] Settlement Agreement, Section III, p. 7.
[13] Settlement Agreement, Section III.D, p. 10.